[No. E053542. Fourth Dist., Div. Two. Aug. 29, 2012.]

REX E. EDWARDS, as Executor, etc., Plaintiff and Appellant, v.
JOHN T. GILLIS, as Trustee, etc., Defendant and Respondent.

**COUNSEL**

Rex E. Edwards, in pro. per., for Plaintiff and Appellant.

Thompson & Colegate, Lisa Killingbeck and Susan K. Brennecke for Defendant and Respondent.

**OPINION**

**MILLER, J.—**

## INTRODUCTION

On December 8, 1988, Eileen P. Gillis (decedent) executed the Eileen Gillis 1988 Trust (hereinafter the Trust) which named her daughter, Beverly Sims (Sims), as successor trustee and distributed the entire contents of the Trust equally between her children Sharyn Christine Matriotti, Barbara Des-Rochers, Wayne Demmel, Kim Des-Rochers, and Sims, upon decedent's death. The Trust provided that the beneficiaries must survive distribution of the assets of the Trust to inherit or their shares would be distributed equally among the surviving beneficiaries. On December 30, 1991, decedent executed a "First Amendment to Declaration of Trust of Eileen Gillis 1988 Trust" (hereinafter First Amendment) which removed Sims as both a beneficiary and successor trustee; the First Amendment named Kim Des-Rochers as successor trustee.

On September 5, 2001, decedent executed a "Second Amendment to Declaration of Trust of Eileen Gillis 1988 Trust" (hereinafter Second Amendment), which removed Kim Des-Rochers as the successor trustee and replaced her with defendant and respondent John T. Gillis, decedent's husband from whom she was legally separated. The Second Amendment provided, "Under no circumstances do I wish my eldest daughter, Beverly Sims, a.k.a., Beverly Edwards, to receive anything whatsoever from my estate or to have any control or influence over the administration or distribution of the estate."

Decedent died on February 22, 2007. On June 29, 2007, Sims filed a petition to void the Trust amendments claiming decedent was ill and in a weakened physical and mental condition when she executed the amendments, and defendant used undue influence and unfair advantage to induce her to amend the Trust. Sims died on May 11, 2008. Defendant made a preliminary distribution to the beneficiaries of $24,000 each on July 22, 2008. Plaintiff and appellant Rex E. Edwards was substituted in as the special administrator and executor of Sims's estate. Defendant successfully moved for bifurcation of the trial to separately consider first whether plaintiff had standing to challenge the amendments because she predeceased distribution. After a bench trial, the court ruled plaintiff failed to demonstrate defendant had unreasonably delayed distribution of the Trust assets; therefore, plaintiff lacked standing to challenge the amendments because even if invalidated, she would not have stood to inherit from the Trust. The court entered judgment for defendant.

On appeal, plaintiff maintains the court applied an incorrect rule of law in requiring plaintiff to bear the burden of proving defendant unreasonably delayed distribution of the Trust assets. Instead, plaintiff contends the court should have applied a rule that would only have required plaintiff prove defendant could and should reasonably have made preliminary distributions of the Trust assets prior to Sims's death. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

The operative petition, after amendment, sustained demurrers, and plaintiff's own requests for dismissal, alleged causes of action for duress and undue influence exercised by defendant in inducing execution of the First Amendment (second cause of action) and duress and undue influence exercised by defendant in inducing execution of the Second Amendment (third cause of action). Sims testified at an expedited deposition due to her poor health that she received an anonymously sent letter from England after her mother's death, in which her mother wrote that she was "forced to remove you from my trust. I am writing this to let you know it was not my intention to take you out of my original trust and will. [¶] . . . [¶] Please don't feel that

I did not appreciate all the work you did for me, and then for me to take you out of my will, that is not what I wanted."

Sims testified she later found another letter addressed to her from her mother behind a picture of her grandmother. In that letter, decedent wrote she "was forced by [defendant] to sign papers saying that if I should die, you are on notice to immediately demand through your attorney to rescind any written agreements. [¶] I was very ill at the time and not able to read the papers that [defendant] was forcing me to sign. [¶] I had a previous encounter years ago and was forced to sign something and was knocked to the ground which is on Police records as it was reported to them." Petitioner prayed for enforcement of the terms of the Trust as of the date it was originally executed on December 8, 1988.

At trial, Nora Teasley, the CPA hired by defendant on March 8, 2007, to conduct accounting and tax preparation for the Trust testified she had worked as a CPA since 1978. She had obtained both a masters degree in business administration and a masters degree in business taxation. She was an accredited estate planner, had taught accounting classes, and was an expert in trust administration. Teasley testified she had prepared approximately 180 fiduciary tax returns for trustees, 34 estate tax preparations, and approximately 50 trust accountings.

The Trust consisted of five real properties; $52,000 in cash; and "prepaid accounts, a small amount of household furnishings, a vehicle, and some clocks and figurines. That total amounted to $19,000." The Trust had debts upon decedent's death consisting of a mortgage of $27,637 immediately due upon her death, another debt based on a marital property settlement which was undeterminable at that time because it was based on a percentage of the proceeds from a prospective sale, and three liens on properties amounting to $34,000. The marital property debt was later determined to be $122,940.36.

One of the real properties, a residence in Newport Beach, was appraised for $2.9 million, but eventually sold for $4 million. The Trust realized $3.6 million in proceeds from the sale, which closed on November 5, 2007. A home in Alta Vista was appraised for $350,000, but sold on February 7, 2008, for $242,068.13; the marital property settlement of $122,940.36 was paid from the proceeds of the sale of the Alta Vista home. Federal estate taxes on the Trust in the amount of $728,152.65 were paid from the sale of the Newport Beach home. Teasley prepared and timely filed the estate tax return.

Defendant sought Teasley's advice regarding the making of preliminary distributions of the Trust assets after the sale of the Alta Vista home; he "was anxious to distribute as soon as he possibly could." Defendant never indicated

any desire to delay distribution. Teasley advised against the distribution. As of March 1, 2008, "there was no independent indication from the Internal Revenue Service what any possible judgment on that U.S. estate tax return that had been filed would be. We did not receive the . . . IRS closing document until 15 months after the filing of the U.S. form 706. . . . We also did not know at that time what additional expenses were going to be incurred in this case. For one thing in maintaining properties and additional costs to the trust. We had no way to measure that."

Teasley testified that in her experience, her advice "to trustees in the past and present had been not to do any significant distribution until after receipt of the U.S. closing document because the personal liability falls totally on the fiduciary. [Defendant] is personally liable." "[M]y recommendation always is to delay any distribution to the beneficiaries until after receipt of the closing letter." She told defendant there was personal risk to him if he made any distributions too early.

A United States estate tax closing letter "is an indication to the CPA and the trustee that there will not be an additional examination by the IRS." "It is definitely prudent for the trustee to delay [distribution] until after the receipt of the closing letter" because "[a]t that point we have somewhat of an assurance that the IRS is not going to look further at the reported document." The CPA guidance service "specifically say[s] it is unwise to distribute prior to receipt of the U.S. Estate Closing Document because of the risk to the trustee or executor . . . ."

Teasley testified in particular that the difference in the appraised value and sale amount of the Newport Beach property caused concern from a tax perspective because the estate taxes had been paid on the appraised value and there was "always the possibility that the Internal Revenue Service could audit [the] return and demand that the $4 million value be used . . . ." Additionally, the Newport Beach property comprised more than 50 percent of the value of the Trust. "The risk is very high when one single asset comprises more than 50 percent of the gross estate [¶] . . . [¶] [b]ecause if the value of that asset is changed in an audit, then the amount of estate tax due could be significantly higher."

Nevertheless, defendant made a distribution from the Trust to the beneficiaries on July 22, 2008, of $24,000 each for a total amount of $96,000. Teasley apparently acquiesced because "there was a strong feeling that it was a small dollar amount" relative to the entire estate. Nonetheless, at that time, three additional parcels of real property had yet to be sold. There was a vacant parcel in Alabama valued at $14,000. A home in Riverside on Brockton Street was appraised at $413,000, but later sold on December 12, 2008, for $189,981,

netting the Trust $173,329.73. Another home in Riverside on Jurupa Avenue appraised for $292,362.85, but sold for $113,993, netting the Trust $85,045.50.

While sale of the various real properties was pending, the estate incurred a lot of expenses repairing, maintaining, and preparing the properties for sale, which were taken out of the cash assets of the Trust, including $46,000 in property management fees. However, after the sale of the first two properties and payment of taxes, the estate had approximately $2.7 million in cash available as of July 22, 2008. Nonetheless, nothing of significance occurred between March 1, 2008, and July 22, 2008, to make Trust distributions any wiser.

The closing letter from the IRS was received on February 19, 2009. On May 20, 2009, defendant made another preliminary distribution from the Trust totaling $750,000. Teasley opined it was not unreasonable for defendant to have made no distribution prior to May 11, 2008, because there was no requirement that such a distribution be made, there was no such request from the beneficiaries, and they had yet to receive the United States estate tax closing letter. She concluded it would have been reasonable and prudent for defendant to wait until after receipt of the letter before making any distributions. Teasley testified defendant promptly administered the Trust; there was no unreasonable delay to any aspect of his administration of the Trust.

Eric Gronroos, a CPA with 24 years of experience and a master's degree in tax, testified on behalf of plaintiff. He testified he had been retained to prepare taxes for estates in over 200 cases, and tax returns in at least 75 trusts. Gronroos testified distributions from trust assets can be made prior to receipt of a closing letter from the IRS: "It is done all the time." He testified that in 100 percent of the cases in which he has been involved, preliminary distributions have been made prior to receipt of a closing letter from the IRS: "I can't think of a case where all the money of the estate was held for an IRS matter." When asked whether it was appropriate to conduct preliminary distribution, Gronroos replied: "Typically what we do is we will estimate the potential tax liability that we feel that there is exposure on the estate, if any, and recommend, based on that calculation, what amount should be withheld for potential disputes with the IRS."

In his opinion, preliminary distributions could have been made "without unreasonably exposing the trustee or the beneficiaries to any tax liability." He believed "the potential liability could be estimated and make a conservative judgment and the balance could have been distributed to the beneficiaries without unreasonably exposing the beneficiaries or the trustee, and that is commonly done in [his] practice." Gronroos conceded trustees are personally

liable to creditors, including the IRS, if they distribute trust assets in amounts in excess of that needed to pay its debts. He described waiting for an IRS closing letter before making disbursements as "a matter of practice. It is not always done. It's not typically done unless there is really something out there that is disturbing."

Defendant testified he did not learn Sims was terminally ill until her deposition in 2008. He made the preliminary distribution on July 22, 2008, at the behest of one of the beneficiaries; he did so over Teasley's objection: "I felt that that small amount of $24,000 would not have a direct impact upon the trust." He also set aside an additional $24,000 should the court determine Sims was entitled to inherit. Defendant testified he deferred to Teasley on virtually all issues regarding the administration of the Trust: "I was a novice. I had never done this before. [¶] . . . [¶] . . . I understood . . . I would be liable for any monies that were not available once distribution had been made had someone come back against the trust like the IRS or State Franchise Tax Board. It would fall on me to make up that difference."

After the court heard testimony, plaintiff argued the standard by which the court should resolve the matter was whether defendant reasonably could and should have made a preliminary distribution. Defendant countered that "[t]he test, which [plaintiff] urges the Court to use, would render virtually every distribution survivorship clause found in any trust completely meaningless. It is almost always the case that some small distribution can be made almost immediately after the trustor's death." The court stated, "the trust document itself provided for the reality that you can't just close an estate right after death. There's some properties that you're going to have to manage while you're closing. And when I look at the trust instrument and the cases, the issue really isn't whether it could have been done, it's whether it was unreasonable to not make a distribution. [¶] . . . [T]he issue is whether, based on all of the circumstances, it was unreasonable to not make a distribution prior to the first distribution date. Based on the evidence submitted, I can't find that it was unreasonable to wait, based on the CPA's testimony saying 'I always consider it imprudent to distribute prior to a closing letter.'" "I can't say that it was unreasonable to wait for distribution to occur, especially when we have a trustee who's not a beneficiary of this trust, and he's the one personally liable if he messes up."

## DISCUSSION

### A. *Unreasonable Delay*

As he argued below, plaintiff contends on appeal the court should have required only that he prove it was reasonable for defendant to have made

preliminary distributions prior to Sims's death in order for him to maintain standing to challenge the Trust amendments. Defendant counters the court applied the correct standard: that plaintiff had the burden to prove defendant unreasonably delayed making preliminary distributions from the Trust assets to the beneficiaries. We agree with defendant.

" 'Questions of law relate to the selection of a rule; their resolution is reviewed independently.' " (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [112 Cal.Rptr.3d 853, 235 P.3d 152], quoting *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) The parties primarily exposit *Estate of Taylor* (1967) 66 Cal.2d 855 [59 Cal.Rptr. 437, 428 P.2d 301] (*Taylor*), *Estate of Germond* (1971) 4 Cal.3d 573 [94 Cal.Rptr. 153, 483 P.2d 769] (*Germond*), and *Estate of Justesen* (1999) 77 Cal.App.4th 352 [91 Cal.Rptr.2d 574] (*Justesen*) in support of their respective positions.

In *Taylor*, the decedent died testate providing in her will that one of the beneficiaries, Ellen Catherine Glasky, would take a third share of the estate if she survived distribution; if not, her share would be distributed equally among the remaining two designated beneficiaries. (*Taylor, supra,* 66 Cal.2d at pp. 856–857.) "The will was admitted to probate on November 26, 1963, and letters testamentary were issued to . . . the executor of the estate, on December 2, 1963. The petition for final distribution was filed March 4, 1965, requesting that one-third of the residue of the estate be distributed to [Glasky]. Hearing on the petition was set for March 29, 1965. [Glasky] died March 15, 1965." One of the remaining beneficiaries then filed a petition requesting that the portion of the estate bequeathed to Glasky be distributed among the remaining beneficiaries. (*Id.* at p. 857.) Glasky's legatees filed an objection to the petition. "The court sustained the objections to the petition for final distribution and decreed that [Glasky's] interest vested in her before her death. The court found that the estate could have been distributed in September of 1964 and should have been distributed before the death of [Glasky] in March of 1965." (*Ibid.*)

On appeal, the court framed the issue as "whether a clause requiring survivorship should be interpreted to mean survivorship to distribution or survivorship to the time distribution should have occurred, or, as an alternative, whether survivorship to the earlier date constitutes substantial compliance with the condition." (*Taylor, supra,* 66 Cal.2d at p. 858.) The appellate court cited the rule that "vesting cannot be postponed by unreasonable delay in preparing an estate for distribution and that when there is such delay contingent interests vest at the time distribution should have been made. [Citation.]" (*Ibid.*) The court held, "[t]he trial court was . . . justified in concluding that the overall delay was unreasonable and in finding that the

estate should have been distributed before [Glasky's] death." (*Ibid.*) "[U]nreasonable delay cannot defeat the beneficiary's interest. This conclusion promotes the established policy favoring prompt distribution of estates [citations] and carries out the presumed intent of the testatrix. In the absence of any indication to the contrary a testator contemplates prompt distribution. His intention is substantially complied with if a beneficiary who is alive at the time distribution could and should have occurred is allowed to take under the will. [Citation.]" (*Ibid.*, fn. omitted.) "In the present case, since distribution was unreasonably delayed, the gift to [Glasky] did not fail . . . ." (*Id.* at p. 859, fn. 2.)

The *Taylor* court reasoned: "[t]here was evidence that the executor . . . knew that [Glasky] was ill and without funds; that she requested him to expedite proceedings concerning distribution of the estate; that inheritance taxes could have been approximately computed; that there was sufficient cash in the estate to pay any such taxes; and that it was therefore unnecessary to sell many of the securities that were sold. The sales that were made, whether necessary or not, could reasonably have been made at an earlier date, and [the executor's] attorney testified that many of the securities in the estate could have been distributed without being sold, but that she 'didn't think of' this possibility. But for the belated decision to sell securities in the fall of 1964, the estate could easily have been distributed in that year." (*Taylor, supra,* 66 Cal.2d at pp. 857–858.)

In *Germond,* the decedent died testate on June 9, 1962, leaving all her property to her sister Jessie Nulsen so long as Nulsen lived until distribution of the estate. If not, the whole estate would be divided and distributed between 10 charities. Nulsen died more than 22 months after decedent's death. (*Germond, supra,* 4 Cal.3d at p. 576.) "The trial court found that the . . . estate could and should have been distributed to . . . Nulsen prior to her death and, more specifically, that the estate 'could and should have been distributed to . . . Nulsen not later than September 19, 1963.' " (*Id.* at pp. 576–577.)

On appeal, the reviewing court noted that "[t]he court applied the rule that vesting of interests which are contingent on surviving distribution cannot be postponed by unreasonable delay in distribution and that when there is such delay contingent interests vest at the time distribution should have been made. [Citation.]" (*Germond, supra,* 4 Cal.3d at p. 577.) "The law, however, does not require an executor to proceed 'as quickly as possible'; it requires him to proceed without 'unreasonable delay.' [Citation.]" (*Id.* at p. 580.)

The appellate court reversed the judgment, holding that although the executor's delay in filing the estate tax return was unreasonable, speedier

liquidation of other assets would not have enabled him to close the estate prior to Nulsen's death. (*Germond, supra,* 4 Cal.3d at pp. 577, 579.) Thus, "[i]n the actual circumstances of this case . . . a preliminary distribution would have been unreasonable, to say the least, because it would have burdened the California realty with a federal tax lien and imposed personal liability on the executor for the amount of that lien, and the . . . estate would never have been able to obtain enough cash to clear the lien." (*Id.* at p. 579.) The court reasoned that although "[i]n some circumstances a reasonable executor might be required to make prompt preliminary distribution" (*id.* at p. 580, fn. 3) the court could not hold "that because there was a survival of distribution clause in the . . . will the executor was required to administer the estate in a manner different from that required by generally accepted reasonable probate practice" (*id.* at p. 580).

In *Justesen,* the decedent left half her estate to Sue Sedlak. The other half was left to George Wasson. If Sedlak died before distribution occurred, however, her share would be distributed to Wasson. (*Justesen, supra,* 77 Cal.App.4th at p. 355.) If both died, the will provided the estate would be distributed to several individuals including LaVon Lightell. Wasson died, and both Lightell and the executor filed competing letters of administration. The court approved Lightell's letter of administration. The executor filed a declaration in support of a request for reconsideration expressing "her concern the estate might not be administered in a timely fashion and that prolonged administration jeopardized the interest payable to Sedlak, who was described as 'aged and infirm.' [The executor] also pointed out the conflict posed by Lightell's opportunity to take under the will as one of the contingent beneficiaries in the event Sedlak did not survive distribution." (*Id.* at p. 356.) The court denied the motion for reconsideration. Several court delays prevented finalizing the petition. (*Id.* at pp. 356–357.)

Sedlak died. Thereafter, the executor filed a petition to determine entitlement to distribution on behalf of Sedlak's estate. The executor "alleged unreasonable delays had occurred in the routine administration of the estate and therefore Sedlak's 50 percent share of the estate should be deemed to have vested before her death on February 7, 1998." (*Justesen, supra,* 77 Cal.App.4th at p. 357.) The contingent beneficiaries, including Lightell, objected. The court denied the petition. (*Ibid.*)

On appeal, the reviewing court framed the issue as "whether there was unreasonable delay in administering [the] estate, and if so, the remedy for such delay." (*Justesen, supra,* 77 Cal.App.4th at p. 355.) The court relied heavily upon *Taylor,* in expositing the applicable rule: "When there is unreasonable delay in distributing an estate, a contingent interest vests at the time distribution should have been made." (*Justesen,* at p. 358, italics

omitted.) "The lesson of *Taylor* is that unreasonable delay in distributing an estate cannot defeat the beneficiary's interest. [Citation.] Where there has been unreasonable delay, contingent interests vest at the time distribution *should have* occurred. [Citation.] The purpose of this rule is to advance the established policy favoring prompt distribution of estates, and to carry out the presumed intent of the testator, who contemplated prompt distribution. [Citation.]" (*Id.* at p. 365.)

The court held "[t]he record reflects there was unreasonable delay by both the personal representative and the probate court, so that Sedlak died before distribution of [the] estate. Unreasonable delay in administration cannot defeat a beneficiary's interest. Therefore, the order denying [the executor's] petition is reversed with directions to grant [the executor's] petition determining her entitlement to distribution." (*Justesen, supra,* 77 Cal.App.4th at p. 355.) "Here, but for unreasonable delay on the part of both Lightell and the trial court, distribution would have occurred prior to Sedlak's death. . . . Therefore, the unreasonable delay by both Lightell and the trial court was prejudicial to Sedlak's interest and the *Taylor* remedy applies." (*Id.* at pp. 364–365.)

■ We acknowledge that the decisions discussed above contain language favorable to the positions of both plaintiff and defendant. However, when read together it is clear the rule that has developed is that any contingent beneficiary who petitions the court contending a preliminary distribution of the assets of an estate or trust could or should have been made at an earlier date has the burden of establishing that the executor or trustee unreasonably delayed such distribution.

This is because any other rule would, as defendant noted below, "render virtually every distribution survivorship clause found in any trust completely meaningless. It is almost always the case that some small distribution can be made almost immediately after the trustor's death." "The law, however, does not require an executor [or trustee] to proceed 'as quickly as possible'; it requires him to proceed without 'unreasonable delay.' [Citation.]" (*Germond, supra,* 4 Cal.3d at p. 580.) Simply because there is a survival of distribution clause in a trust should not require that the trustee administer the trust in a manner different from that required by generally accepted reasonable trust practices. (*Ibid.*)

■ Indeed, in almost every case, a trustee could immediately make preliminary distributions in some diminutive amount without any risk to himself or the trust and, thereby, ensure all beneficiaries, contingent or not, would inherit. However, this would, as defendant noted, effectively defeat all distribution survivorship clauses. " ' "In construing a trust instrument, the

intent of the trustor prevails . . . . [Citation.]" [Citation.]' " (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73 [70 Cal.Rptr.2d 887].) If a trustor wishes all beneficiaries to take immediately upon her death, she can so provide in the trust. However, where she includes a provision that allows the beneficiaries to take only upon survivorship of distribution, we hold any contingent beneficiary's interest vests only when she meets the contingency, distribution actually occurs, or when that beneficiary, or her heirs, can prove a time, before her death, beyond which any distribution was unreasonably delayed.

For sure, in determining whether distribution was unreasonably delayed, a court should examine the assets of the trust, the health and financial condition of the contingent beneficiaries, and any personal interest the trustee might have in delaying distribution. However, none of these considerations should change the underlying rule that the contingent beneficiary must prove the trustee unreasonably delayed distribution. Thus, the trial court applied the correct rule of law.

### B.  *Substantial Evidence*

Although not argued by plaintiff, defendant asserts the trial court's ruling that plaintiff failed to adduce sufficient evidence that defendant unreasonably delayed distributions of the Trust's assets was supported by substantial evidence. We agree.

None of the cases cited above discussed the standard of review for use by an appellate court in determining whether the trial court's ruling was appropriate. We agree with defendant that the sufficiency of the evidence standard is the appropriate one. "It is the duty of an appellant who claims insufficiency of the evidence, as here, 'to demonstrate that there is no substantial evidence to support the challenged findings' [citation]." (*Estate of Edwards* (1959) 173 Cal.App.2d 705, 711 [344 P.2d 89].)

■ Here, sufficient evidence supported the trial court's determination defendant did not unreasonably delay distribution of the Trust's assets. First, defendant had no personal, financial interest in the assets of the Trust; thus, he did not stand to gain by delaying distribution. Second, Sims had not been a beneficiary of the Trust since execution of the First Amendment on December 30, 1991—over 15 years by the time decedent died on February 22, 2007. Thus, defendant could hardly be said to have unreasonably delayed distribution so as to disinherit someone who did not, from his perspective, have any claim on the Trust. Third, defendant testified he did not learn of Sims's ovarian cancer until her deposition on March 18, 2008, only three months before her death, but more than a year after decedent's death. It is simply untenable to contend defendant should have issued a distribution in

the three months between learning of Sims's fatal illness, and her death, when he did not issue one in the preceding 13 months, and Sims had no standing at that time to benefit from such a distribution.

Fourth, defendant relied upon the advice of Teasley, an experienced and educated professional in the field of trust administration in determining when to make distributions. Teasley testified defendant was eager to make distributions, which she advised against. Teasley testified it was her practice to always advise against distributions until after receipt of the IRS closing document, because the trustee would become personally, financially liable for any further amounts determined to be owed if the Trust assets were insufficient to cover the liability. Teasley testified the practice guide in trust administration specifically advises against distribution prior to receipt of the closing document. Moreover, the tax preparations she had produced used the $2.7 million appraised value of the Newport Beach property, rather than the $4 million for which it later sold. Likewise, that property alone comprised more than 50 percent of the value of the Trust, a factual condition which is more likely to trigger an audit. Thus, Teasley opposed any distribution out of concern the IRS would audit the Trust and demand more in taxes than had been paid. Any distributions would diminish the Trust's assets to pay any further taxes and heighten the personal, financial risk to defendant.

Furthermore, the Trust still had a number of remaining properties for which the Trust incurred costs for upkeep, management, and preparation for sale. Teasley stated she could not estimate what those costs would be. Moreover, two of the remaining homes sold for significantly less than their appraised value.

Fifth and finally, Teasley opined defendant promptly administered the Trust; there was no unreasonable delay in his administration of the Trust. Although Gronroos testified preliminary distributions could have been made without exposing defendant to personal liability, he never opined that defendant unreasonably delayed any distributions. Moreover, he admitted that waiting for an IRS closing letter before making disbursements is "a matter of practice." Thus, plaintiff failed to adduce sufficient evidence that defendant unreasonably delayed making distributions from the Trust. Substantial evidence supported the court's ruling that "[t]here was no unreasonable delay in the distribution of the . . . Trust prior to May 11, 2008. It was not unreasonable that no distribution had been made as of May 11, 2008[,] in light of the fact that the Trustee received advice from the trust's accountant . . . that it would not be prudent to make a distribution."

## DISPOSITION

The judgment is affirmed. Responded is awarded his costs on appeal.

Richli, Acting P. J., and King, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 14, 2012, S205832.