Filed 2/19/14  Buser v. Buser CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| MARTIN BUSER, as Trustee<br><br>    Respondent,<br><br>    v.<br><br>DOUGLAS BUSER,<br><br>    Appellant. | D064000<br><br><br>(Super. Ct. No. 37-2010-00150555-PR-<br> TR-NC) |

APPEAL from an order of the Superior Court of San Diego County, Julia Craig Kelety, Judge.  Affirmed.

Douglas Buser, in pro. per., for Objector and Appellant.

Hickson Kipnis & Barnes, Howard A. Kipnis and Steven J. Barnes for Petitioner and Respondent.

Douglas Buser appeals from a probate court order approving a preliminary distribution of the assets in the trust established by appellant's deceased parents. Appellant asserts the court abused its discretion in approving the preliminary distribution. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1997, Floyd and Donna Buser (the parents) established a trust for the distribution of their assets upon their death to their three sons (appellant, Martin Buser, and Burton Buser). Martin was named as successor trustee upon their death or incapacity and was granted power of attorney. In 2009, Donna died. Martin gradually assumed responsibility for the management of Floyd's financial affairs, and in 2011 took over as successor trustee due to Floyd's dementia.

The parents owned five real estate properties, known as the Padilla, Park, Bogue, Rosecrans, and San Marino properties.[1] Before Floyd's death, Burton moved into the San Marino property (where he and his wife took care of Floyd) and appellant moved into the Rosecrans property. Apparently Burton and appellant did not pay rent. Starting in 2010, Martin and appellant became involved in litigation that relates to the trust but concerns issues not directly involved in this appeal. A separate appeal filed by appellant arising from this dispute is currently pending before our court. (*Buser v. Buser*, D063381.)

On May 3, 2012, Floyd died. As we detail below, nine months after Floyd's death, Martin filed with the court a plan for final distribution of the trust assets, and appellant objected to this plan. After several hearings, the court approved a preliminary

---

[1] The parties refer to one of the properties as both the San Marino property and the Winthrop property; we refer to it as San Marino.

distribution of assets, with the issue of the final distribution to be decided at a future date. The order approving the preliminary distribution is the subject matter of this appeal.[2]

I. *Distribution Proposals and Objections Considered by the Court*

The trust provides for the distribution of the trust assets in equal shares to the three sons. Relevant to the issues raised on appeal, in 2006 the parents amended the trust to accommodate a $186,000 loan they made to Burton that was not repaid. The amendment states that "[a]ssets of the estate equal in value to $186,000" shall be distributed to both appellant and Martin, and the "balance of the estate shall be distributed in equal shares" to the three sons.[3]

A. *Martin's Proposed Final Distribution Plan and Appellant's Objections*

On February 8, 2013, Martin filed a final accounting (for the period of May 3, 2012 through October 31, 2012), and a petition for approval of a final distribution of the trust estate (the Final Distribution Plan or Plan). In this pleading, Martin stated generally that some of the beneficiaries owed obligations to the trust and others were entitled to payments, and noted that the trust assets were to be distributed equally to the three sons after first deducting $186,000 from Burton's share.

---

[2] Appellant was represented by counsel in the proceedings before the trial court, and is representing himself on appeal.

[3] The amendment states in relevant part: "Settlors made loans to their son, BURTON G. BUSER in the approximate amount of $186,000.00. These loans have not been repaid and were discharged in bankruptcy. . . . [¶] . . . [¶] . . . The . . . Trust . . . shall be distributed as follows: [¶] (i) Assets of the estate equal in value to $186,000.00 shall be distributed to DOUGLAS A. BUSER . . . . [¶] (ii) Assets of the estate equal in value to $186,000.00 shall be distributed to MARTIN B. BUSER . . . . [¶] (iii) The balance of the estate shall be distributed in equal shares to the sons of Settlors . . . ."

More specifically, the Final Distribution Plan states that as of October 31, 2012, the total value of the estate is $5,670,196.96. Before calculating the one-third distribution to each beneficiary, the Plan states there are two "[e]qualling allocation[s]" for appellant and Martin: that is, (1) $186,000 and $18,500 to appellant, and (2) $186,000 and $48,500 to Martin.[4] After these equaling allocations, the Plan states that the total value of the estate is $5,231,196.96, which entitles each beneficiary to a one-third distribution of $1,743,732.32.

The Plan then calculates the particular distributions for each beneficiary. For appellant, he is first entitled to the equaling allocations of $186,000 and $18,500. Second, his one-third estate distribution of $1,743,732.32 is allocated as: (a) receipt of the Rosecrans property valued at $1.4 million; (b) receipt of personal property from the estate valued at $14,133; (c) $184,682.34 debt to estate owed by appellant (consisting of $50,000 for a loan; $119,682.34 for court costs; and $15,000 for rent receivables); (d) $50,000 to be kept in the estate as a reserve for expenses and contingencies; and (e) $94,916.98 cash distribution from the estate to appellant. The total cash distribution to appellant would be $299,416.98 (the equaling allocations of $186,000 and $18,500, plus the $94,916.98 from the one-third distribution).

Burton's proposed distribution consists of his one-third estate distribution of $1,743,732.32 allocated as: (1) receipt of personal property from the estate valued at $14,134; (2) $13,569.14 debt to the estate owed by Burton (consisting of $3,364 for a car

---

4    The $18,500 and $48,500 equaling allocations owed to appellant and Martin, respectively, are referred to in a 2011 settlement agreement reached between the parties.

4

loan and $10,205.14 for rent receivables); (3) $50,000 reserve kept in the estate; and (4) $1,666,029.18 cash distribution from the estate to Burton.

For Martin, he is first entitled to the equaling allocations of $186,000 and $48,500. Second, his estate distribution consists of: (a) receipt of the Padilla, Park, Bogue, and San Marino properties, valued at $575,000, $880,000, $1,750,000, and $897,600.41, respectively; (b) personal property valued at $14,133; and (c) $50,000 reserve kept in the estate. This estate distribution (the real estate, personal property, and reserve) totals $4,166,733.41, which exceeds his one-third share of $1,743,732.32 by $2,423,001.09. Accordingly, he is required to make a $2,188,501.09 cash contribution to the estate (consisting of $2,423,001.09 minus his equaling allocations of $186,000 and $48,500).

*Appellant's Objections*

On March 28, 2013, appellant filed objections to the Final Distribution Plan, claiming the trust estate was not in a condition to be closed. He raised numerous objections, including that Martin had not provided adequate financial accountings, had mismanaged trust assets, had incurred unnecessary legal expenses, and had requested excessive trustee fees. Appellant also claimed that Martin's valuations of the trust assets did not reflect market values, and appellant believed the Rosecrans property was presently worth under $1 million rather than $1.4 million. Appellant stated that once he was provided the information withheld by Martin, he planned to submit a different final distribution plan. Appellant requested that the court grant relief by, inter alia, ordering discovery and additional accounting from Martin, appointing a temporary trustee in lieu of Martin, and imposing liability on Martin for his breach of duties.

5

B. *Martin's Preliminary Distribution Proposal and Appellant's Objections*

On April 8, 2013, Martin filed a supplemental pleading seeking authority to make preliminary distributions from the trust (the Preliminary Distribution Proposal or the Proposal). Martin explained that Burton was in dire financial straits and needed money to move out of the San Marino property and to sustain himself financially.[5] To accommodate Burton's request, Martin filed the Preliminary Distribution Proposal, requesting that—pending determination of appellant's objections to the Final Distribution Plan—the court grant him authority to distribute a value of $1.4 million to each beneficiary and to sell the San Marino property. Martin stated that appellant had expressed a desire to receive an in-kind distribution of the Rosecrans property, and accordingly Martin incorporated this request into the Proposal.

In the Proposal, Martin stated that the estate had a value of about $5,750,000, of which 96 percent was in residential real estate. The cash assets totaled about $90,000. Martin proposed that each beneficiary receive $1.4 million of the trust assets, except that Burton's share would be reduced by $186,000. Appellant would receive the Rosecrans property valued at $1.4 million; Burton would receive $1,214,000 in cash ($1.4 million minus $186,000); and Martin would receive the Bogue property (valued at $1.75 million) and make a $350,000 cash contribution to the estate (to equalize the difference between $1.75 million and $1.4 million). Also, to provide the trust with the cash necessary to

---

5    According to Martin's pleading, Burton had appeared in court at a hearing on April 4, 2013, and made a plea for immediate funds because he was " 'broke,' " and the court had suggested that Martin file a request for approval of a preliminary distribution.

6

make the preliminary cash distribution to Burton, Martin would make a personal loan of $1,214,000 to the trust, which would bear interest "at [the] market rate" and be secured by deeds of trust on the remaining trust properties (Padilla, Park, and San Marino). The total net distribution from the trust would be $4,014,000 ($4,364,000 total distribution minus Martin's $350,000 equalizing payment).

After the preliminary distributions, the trust would retain assets having a total net value of approximately $1,600,000. That is, the trust would have (1) the Padilla, Park, and San Marino properties (total value of $2,355,000); and (2) cash assets of $440,000 (the existing $90,000 plus the $350,000 equalizing payment by Martin).[6] After subtracting Martin's $1,214,000 loan to the trust, the net value of the trust would be $1,581,000.

Martin stated that if appellant prevailed on any of his objections to the Final Distribution Plan and/or on the issues raised in his pending appeal, there would be sufficient assets in the trust to make the necessary adjustments in appellant's favor. Martin explained that if appellant prevailed in his pending appeal, this could alter the $120,000 that was allocated to appellant's share of the trust estate as court costs he owed to the estate, and if appellant prevailed in his challenges to the real estate appraisals, it was unlikely the necessary adjustments would exceed $100,000 to $150,000.

---

[6]     Martin listed the Padilla, Park, and San Marino properties as valued at $575,000, $880,000, and $900,000, respectively. He listed the cash assets as $10,000 with Bank of America, $80,000 with Schwab Brokerage, and $350,000 from his equalizing payment.

*Appellant's Objections*

On April 30, 2013, appellant filed an objection to Martin's Preliminary Distribution Proposal. Appellant stated the Proposal "suffers from the same fundamental problem as the proposed final distribution in that it calls for distributions 'in-kind' based upon value and allocations that are not acceptable" to appellant. Appellant stated that he "has not agreed to accept certain properties as his share of the Trust estate and cannot accept such properties without information concerning trust administration and the establishment of acceptable distribution values for all properties." Appellant also objected to Martin becoming a secured creditor of the trust estate, contending that this created a conflict of interest based on his role as trustee and beneficiary. Appellant suggested that to meet Burton's need for cash, the trust should make an immediate $25,000 cash distribution to each beneficiary and distribute $2,000 per month to each beneficiary, which would allow Burton to continue living in the San Marino residence.

*Martin's Response*

On May 3, 2013, Martin filed a response to appellant's objections to the Preliminary Distribution Proposal. Martin noted that the trust gave the trustee broad powers to allocate the trust estate; make preliminary distributions "in kind"; withhold final distribution based upon competing claims; make loans with his own funds to the trust with interest at current rates and secured by trust assets; and purchase assets of the trust at their fair market value as determined by an independent appraiser. He repeated the terms of his Preliminary Distribution Proposal, and reiterated that the $1.6 million assets remaining in the trust after the proposed preliminary distribution would be "more

than sufficient to address any possible adjustments among the three remainder beneficiaries."

Further, Martin stated that Burton and his wife wanted to move out of the San Marino residence; Burton indicated he would do so as soon as he received the proposed distribution; and this would allow Martin to sell the residence. As to the in-kind distribution to appellant, Martin stated that appellant had requested in writing that the Rosecrans property be distributed to him; appellant had been living there for over three years; and if appellant did not want to receive the Rosecrans property he needed to make this clear to Martin and the court.

II. *Trial Court's Order Approving the Preliminary Distribution Proposal*

At a hearing on May 6, 2013, the court ruled that Martin could make the requested preliminary distributions from the trust, ordering as follows: (1) Martin could distribute $1,214,000 cash to Burton; Burton should vacate the property by July 8, 2013; and Martin could sell the property; (2) Martin could distribute the Bogue property to himself, and the value of the property "shall be determined at a later date"; (3) appellant should inform Martin by July 1, 2013, whether he wishes to have the Rosecrans property distributed to him "at a value as of the time of distribution to be determined at a later date," or whether he wishes to vacate the Rosecrans property and receive a cash distribution upon the sale of the Rosecrans property.

DISCUSSION

A preliminary distribution from an estate is proper when "it appears that the distribution may be made without loss to creditors or injury to the estate or any interested

9

person." (Prob. Code, § 11621, subd. (a); *Estate of Toler* (1957) 49 Cal.2d 460, 468.)[7] A preliminary distribution may be made even when there are pending disputes about the estate distribution, as long as there are sufficient assets available to properly accommodate the outstanding matters. (See *Estate of Anderson* (1977) 68 Cal.App.3d 1010, 1016-1017; *Estate of Morelli* (1951) 102 Cal.App.2d 39, 42.)

On appeal, we review a preliminary distribution order for abuse of discretion, drawing all reasonable inferences in favor of the court's order. (*Estate of Beard* (1999) 71 Cal.App.4th 753, 780.) "In the absence of a clear showing that the probate court abused its broad discretion in concluding that the estate was in such condition that the preliminary distribution could be safely made, its determination in that regard may not be reversed on appeal." (*Estate of Toler, supra*, 49 Cal.2d at p. 468.)

On appeal, appellant raises a variety of arguments to support his claim that the trial court abused its discretion by approving Martin's Preliminary Distribution Proposal, including that the distribution violates the trust terms; the court failed to evaluate the financial impact of the distribution; it was improper to make a distribution when the real estate valuations are undetermined; the distribution terms favor Martin's interests and create a conflict of interest; and the court failed to follow various rules.

---

[7] Although these authorities concern a probate estate rather than a trust estate, the probate and trust estate rules may be used interchangeably to the extent they involve substantially the same considerations. (See, e.g., *Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 134; *Estate of Thompson* (1958) 50 Cal.2d 613, 616; *Edwards v. Gillis* (2012) 208 Cal.App.4th 1318, 1329.)

We note that several of the issues raised by appellant were not raised before the trial court at all, or were not raised until after the court's ruling in a motion for reconsideration. The record on appeal does not show how the reconsideration motion was resolved. Moreover, the record does not include a reporter's transcript or settled statement of any of the hearings before the trial court. To obtain appellate review of an issue, the appellant must pursue the claim before the trial court and provide an adequate record on appeal to permit meaningful review. (*In re Marriage of Freeman* (1996) 45 Cal.App.4th 1437, 1450-1451; *Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125-1126.) A self-represented litigant is held to these same rules. (*Bianco, supra*, at pp. 1125-1126.) As we consider each of appellant's contentions, our review is in some instances forestalled or limited due to appellant's failure to comply with these requirements.

A. *Claim of Delayed Distribution to Appellant in Violation of Trust Terms*

Appellant asserts the Preliminary Distribution Proposal approved by the court failed to follow the terms of the trust which—to accommodate the $186,000 unpaid loan to Burton—require that appellant receive an affirmative distribution of $186,000 *before* the assets are divided among the three sons. Appellant contends the effect of the court's order is to delay distribution to him, and the court violated the trust terms by approving distributions to Martin and Burton before him.[8]

To determine whether the court's order violates the trust terms, we give the words used in the trust their ordinary and common sense meaning, with a view to carrying out the trustors' intent. (*Estate of Simoncini* (1991) 229 Cal.App.3d 881, 888-889.) The trust states that appellant and Martin should each receive a distribution of "[a]ssets of the estate equal in value to $186,000" and that the balance of the estate should be distributed in equal shares to the three sons. (See fn. 3, *ante*.) The preliminary distribution order provides for a distribution of the Rosecrans property to appellant, either as an in-kind distribution of the property or a cash distribution upon the sale of the property, at appellant's election. There is no dispute that the Rosecrans property is worth far more than $186,000.

The plain language of the trust allows the $186,000 distribution to be based on *assets* that are equal to this monetary amount. This language does not suggest or imply

---

[8]     Appellant's claim that the Preliminary Distribution Proposal violates the trust terms was not raised before the trial court until appellant filed the motion for reconsideration after the court's ruling. We exercise our discretion to consider this particular claim because it does not require us to resolve any factual disputes.

that appellant must receive $186,000 *cash* before any one-third division of the assets can occur among the beneficiaries, nor does it preclude deriving the $186,000 distribution from the receipt, or sale, of real estate. The trustors' clear intent was to ensure that appellant and Martin were placed on an equal financial footing with Burton given Burton's receipt of $186,000 before the trustors' deaths. The preliminary distribution satisfies this directive by distributing the Rosecrans property to appellant either in kind or in cash upon sale, as elected by appellant.

B. *Claim that Court Failed To Evaluate the Financial Impact of the Proposal*

Appellant argues the court failed to evaluate the financial impact of the preliminary distribution on the trust. He contends the distribution removed the largest income producing property from the trust (the Bogue property), and it encumbered the two remaining income producing properties (the Padilla and Park properties) with a promissory note. Further, he claims it was improper to allow Martin to encumber the trust with a promissory note without disclosing the terms of the note and the interest rate other than Martin's statement it would be at the market rate. He asserts the trust could suffer a negative cash flow problem because of the loss of income from the Bogue property, the fact that the remaining real estate assets are illiquid, and the creation of the debt service obligations.

Based on these claims, appellant contends a cash flow analysis was needed to determine if the plan was reasonable. He asserts Martin did not provide a financial evaluation to the court; the court should have continued the hearing and ordered Martin to

13

provide the basic details of the plan to the beneficiaries; and the court did not give appellant time to prepare an analysis.

Appellant has not cited to anything in the record showing that he objected to the preliminary distribution because of a potential cash flow concern, or that he requested more time to respond to the proposal for purposes of preparing his own cash flow analysis. Accordingly, these claims are forfeited on appeal. (*Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113.)

Moreover, the record supports a finding that the trust would remain financially viable after the preliminary distribution. In the Preliminary Distribution Proposal, Martin set forth information showing that after the preliminary distribution, the trust would retain a net value of about $1.6 million, including $440,000 in cash ($350,000 which was derived from Martin's equalizing payment). Appellant has not shown the liquid assets would be insufficient to meet the debt service obligations or other trust expenses until the San Marino property is sold. We note that although the court's order does not explicitly state that Martin must make the proposed $350,000 equalizing payment (apparently because the court decided to leave the real estate valuations open), the court could reasonably assess that Martin, as a beneficiary, had a personal interest in maintaining the value of the trust estate and hence would carry out the preliminary

distribution in a manner that would ensure an adequate cash flow.[9]

Appellant's contention that the court could not properly approve a distribution proposal that failed to disclose the terms and interest rate for the promissory note is unavailing. The trust allows the trustee to loan the trustee's own funds "to the trust for any trust purpose, with interest at current rates" and to encumber the trust assets to secure any such loan.[10] Given this broad authority provided to the trustee under the trust, appellant has not shown that the court was required to order the trustee to specify further details of the promissory note needed to make the cash disbursement to Burton.

C. *Challenge to Later Valuation of Real Estate*

Appellant asserts the trial court erred in allowing the values of the real estate to be determined at a later date. He contends the valuations affect how the distributions should be made to the beneficiaries, and thus the valuations should be agreed upon before any partial distribution of the trust assets.

[9] Consistent with this, in written communications to appellant discussing proposed wording for the court's written order, Martin's attorney stated that Martin intended to make the $350,000 cash contribution: "Rest assured that while Martin intends to proceed with the equalizing payment to the Trust in the amount of $350,000 as set forth in the [Preliminary Distribution Proposal], in our view since it is not set forth in the Court's minute order, it need not be spelled out in the written order."

[10] This provision setting forth the trustee's powers states: "To loan or advance the Trustee's own funds to the trust for any trust purpose, with interest at current rates; to receive security for such loans in the form of a mortgage, pledge, deed of trust, or other encumbrance of any assets of the trust; to purchase assets of the trust at their fair market value as determined by an independent appraisal of those assets; and to sell property to the trust at a price not in excess of its fair market value as determined by an independent appraisal."

15

The trial court's decision to leave open the real estate valuations reasonably accommodated the competing interests arising from Burton's need for immediate cash and appellant's challenge to the real estate valuations presented by Martin. Again, the information provided by Martin supports that in the event the court finds any of Martin's valuations are inaccurate, the $1.6 million net value remaining in the estate after the preliminary distributions is sufficient to make any needed equalizing adjustments in the final distribution. Under these circumstances, the trial court was not required to delay all distributions until the valuation dispute was resolved.

### D. Claim that Proposal Favors Martin's Interests and that
### Martin Has a Conflict of Interest

Appellant asserts that Martin's distribution favored Martin's interests over his interests because Martin gave himself a property valued at $1.7 million, whereas appellant was given an option of receiving a property valued at $1.4 million. Further, he contends that Martin at first proposed making a $350,000 equalizing payment into the trust (i.e., in the Preliminary Distribution Proposal), but then Martin removed this contribution in his subsequent pleading to the court (i.e., in his response to appellant's objections to the Preliminary Distribution Proposal).

Appellant's assertion that Martin submitted a proposal that eliminated the $350,000 equalizing payment misstates the record. Contrary to appellant's summation of Martin's pleadings, Martin's response to appellant's objections to the Preliminary Distribution Proposal was *not* a third distribution proposal; rather, it was merely a response to appellant's objections, and it reiterated the terms of the Preliminary

16

Distribution Proposal, *including* the $350,000 equalizing payment. Thereafter, in its order approving the Preliminary Distribution Proposal the court left the real estate valuations open. Given that the valuations were left undecided in the preliminary distribution order, the court reasonably declined to calculate what equalizing payments should be made. It is clear from Martin's various submissions to the court that when the valuations are ultimately determined, equalizing payments will be calculated and ordered at that time. Appellant's claim of unfairness in this regard is unavailing.

Appellant further asserts that Martin "prematurely allocated himself the largest income producing property and the biggest cash flow generator of the trust for his own benefit while arbitrarily allocating a non-income-producing residential property to [appellant] in a 'take it or leave it' manner." Appellant has not cited to anything in the record showing that the Bogue property is the largest income producing property. Even assuming that it is, the income producing characteristics of the Bogue property will be reflected in the market valuations that are still to be determined and appropriate equalizing payments will be ordered.

In his motion for reconsideration filed after the court's order approving the Preliminary Distribution Proposal, appellant—apparently for the first time—told the court that he wanted to be allocated the Bogue property and other income producing property. As noted, the record on appeal does not indicate how the reconsideration motion was resolved. On appeal, appellant complains in general fashion that the distribution of the Bogue property to Martin was premature and arbitrary, but he does not specifically claim that he wanted to receive this property and be subjected to any required

17

equalizing payment.  An issue not raised on appeal is deemed abandoned.  (*Multani v. Witkin & Neil* (2013) 215 Cal.App.4th 1428, 1442, fn. 6.)  Given that appellant's challenge to the allocation of the Bogue property to Martin was raised in belated fashion before the trial court and was not squarely raised on appeal, appellant has not shown the trial court abused its discretion in approving the distribution of the Bogue property to Martin.

To support his challenge to the court's distribution order, appellant also states that he never requested that the Rosecrans property be *distributed* to him, but rather he told Martin that he was interested in *purchasing* it.[11]  He posits that a purchase "involves a reasonable price with offsets for deferred maintenance."  Deferred maintenance issues can be addressed in the valuation of the Rosecrans property regardless of whether it is purchased by, or distributed to, appellant.  Appellant has not established that distribution of the Rosecrans property to him (either in kind or in cash upon a sale) will prejudice his interests as compared to his purchase of the residence.

Appellant further contends that Martin has a conflict of interest because under the court's order he is a secured lender with the right to foreclose, a beneficiary, and a trustee. Appellant acknowledges that under the trust terms, Martin could properly loan his own funds to the trust.  (See fn. 10, *ante*.)  Thus, he apparently recognizes that a trustee's loan to a trust permitted under the trust terms is not viewed as a conflict of interest.  (See

---

[11]    Appellant's request to purchase the property is contained in a letter written to Martin shortly after his father's death, stating:  "Now that the Trust has entered a new phase, I am interested in purchasing 541 Rosecrans when it is the appropriate time."

18

*Estate of Thompson, supra*, 50 Cal.2d at pp. 616-617 [trust may authorize transactions by trustee that might otherwise constitute prohibited self-dealing]; *Copley v. Copley* (1981) 126 Cal.App.3d 248, 278-279.)  However, he contends that Martin's wife, along with Martin, is a holder of the promissory note, and this is improper because she is a stranger to the trust.  The record on appeal does not show that the court was presented with a proposed promissory note at the time of its order approving the Preliminary Distribution Proposal.  Our review is confined to matters submitted to the trial court.  (See *In re Zeth S*. (2003) 31 Cal.4th 396, 405.)  In any event, even assuming Martin's wife is a holder of the promissory note, the trust broadly permits the trustee to "borrow money and to encumber trust property," which can reasonably encompass a promissory note from a third party such as Martin's wife.[12]

### E. *Claim that Court Failed To Follow Rules*

Appellant asserts the court failed to follow various rules, including the rule placing the burden of proof on Martin as the petitioner.  Absent a contrary indication in the record, we presume the court properly followed the law.  (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.)  The record on appeal does not include any reporter's transcripts or a settled statement which might have reflected the reasoning underlying the court's order, and the record before us does not show the court failed to place the burden of proof on Martin.

---

[12]    The trust states that the trustee has the power to "borrow money and to encumber trust property by mortgage, deed of trust, pledge, or otherwise, for the debts of the trust . . . ."

Appellant also contends the court erred in accepting Martin's response to appellant's objections to the Preliminary Distribution Proposal even though the response was filed late. He asserts that because of the late filing, he was unable to prepare a timely objection to the response. The record shows that in March and April 2013, appellant filed objections to Martin's Final Distribution Plan and Preliminary Distribution Proposal. Thereafter, on May 3, 2013, Martin filed a response (which was stamped "LATE" but accepted for filing) to appellant's objections to the Proposal. The hearing on the Preliminary Distribution Proposal was held on May 6, and appellant appeared at this hearing with counsel. Appellant has not cited to anything in the record showing that he requested more time to respond to Martin's response, or that he was impeded from presenting any significant information to the court because Martin's response was filed late. Significantly, Martin's response was *not* a new or revised distribution plan, but simply a response to appellant's objections to the Preliminary Distribution Proposal.

In the reconsideration motion presented to the trial court after the May 6 hearing, appellant's attorney stated that he did not have an opportunity to adequately review the late-filed response. This pleading, standing on its own and with no information as to its resolution, does not suffice to show prejudicial error arising from the court's acceptance of Martin's late response. Moreover, the specific claims of error raised in the reconsideration motion have been resolved in this appeal.

Appellant also cites various local court rules relating to timeliness, notice, and other matters, and claims these rules were violated. We reject these assertions because he

20

fails to present an adequate record and/or arguments to support his claims of prejudicial error on these points. (See *Multani v. Witkin & Neil, supra*, 215 Cal.App.4th at p. 1457.)

Appellant has not shown the court abused its discretion.

DISPOSITION

The order is affirmed. Appellant to pay respondent's costs on appeal.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


McINTYRE, J.